233 So.2d 331 (1970)
LUTHERAN CHURCH OF the GOOD SHEPHERD OF BATON ROUGE, Louisiana
v.
John CANFIELD et al.
No. 7912.
Court of Appeal of Louisiana, First Circuit.
March 9, 1970.
Rehearing Denied April 13, 1970.
*333 Taylor, Porter, Brooks & Phillips, by William A. Norfolk, Dodd, Hirsch, Barker, Avant & Wall, by James D. Thomas, II, Dyer & Wilson, by Billy O. Wilson, Seale, Smith, Baine & Phelps, and Kantrow, Spaht, Weaver & Walter, Baton Rouge, for appellant.
Robert L. Kleinpeter, Baton Rouge, for appellees.
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
This action seeks recovery of $31,299.28 damages sustained in a fire which originated in a heating unit in the newly constructed Lutheran Church of the Good Shepherd (Church), Baton Rouge, Louisiana. Plaintiff, The Lutheran Benevolent Association (Association) sues as subrogee of the Church. Defendants are (1) John H. Canfield, General Contractor (Canfield), who built the church; (2) Bergeron Sheet Metal Works (Bergeron), the subcontractor who installed two heating units in the church, and (3) The Payne Company, manufacturer of the heating systems. The trial court rejected plaintiff's demands against all defendants save Payne who was held liable under the doctrine of res ipsa loquitur. Payne has appealed contending the trial court erred in (1) applying the principle of res ipsa loquitur to the facts of this case; (2) failing to find Payne free of negligence, and (3) failing to hold the Church guilty of contributory negligence through its pastor-agent, Reverend Arthur C. Widiger. We find the doctrine of res ipsa loquitur inapplicable and also find that plaintiff has failed to establish negligence on the part of any defendant with that degree of certainty required by law. We reverse the judgment against Payne and dismiss plaintiff's action as to all defendants.
Canfield and Bergeron third partied Underwood, Verges & Associates, Inc. (Architects), the designing architects, and E. E. Verges, individually (Verges), member of the firm. These third party plaintiffs contend they merely followed the Architects' plan, therefore, they should recover from the Architects and Verges in the event the contractor and subcontractor be found liable. The Architects and Verges denied liability and in turn third partied James V. Reuter, Consulting Mechanical Engineer who planned the heating systems under retainer by Verges. Canfield devolutively appealed asserting contributory negligence on the part of the Church. Alternatively, Canfield urges that either Payne, the Architects or Verges were negligent. Bergeron has likewise appealed reserving its rights against Payne, Architects, Verges and Reuter in the event Bergeron should be cast on appeal. Plaintiff has also appealed asking affirmation of the judgment rendered below. Alternatively, plaintiff seeks judgment against Canfield, Bergeron or the Architects.
In the year 1965, Canfield, as prime contractor, constructed a church for plaintiff, pursuant to complete plans and specifications prepared and furnished by the Architects. The plans called for installation of two heating units specified by Reuter who was engaged by the Architects to design the heating system and supervise its installation. The original plans called for the heaters to be installed in the open loft or choir of the building, one on either side. It was contemplated that the stairwell to the choir or loft would serve as a source of "return air" to the units. However, in the course of installation, City Inspector, H. A. Martin (Martin), concluded it was inadvisable to use the stairwell as a source of return air. He also deemed it better to enclose the heaters in separate rooms so that they would not draw combustion air directly from the inside of the building in which the congregation would assemble. It is undisputed that consideration of Martin's recommendation prompted a change in the initial plans pursuant to consultations *334 between Reuter, the Architects and Canfield. Instead of enclosing the heaters in rooms as suggested by Martin, it was decided to extend the intake ducts of the heaters to obtain fresh air from outside.
The heaters were shipped from Payne's factory no later than early June, 1965, each in two separate crates. One carton contained the main portion of the heater, the other held the draft diverter and combustion air duct. The combustion air duct is simply a flat panel which attaches to one end of the heater with metal screws. When correctly affixed, the open end of the duct fits flush with the top of the heater leaving a rectangular opening measuring approximately four by twenty-four inches. Through this aperture, combustion air is admitted into the heater from the immediate area in which it is installed. The draft diverter also attaches to the main heater housing by metal screws. The intake opening of the manufacturer supplied duct was not equipped with phalanges, holes or plates indicating that an attachment or extension was to be affixed thereto.
To obtain outside air as deemed advisable by Martin, the intake duct of each unit was modified. With the knowledge, consent and approval of the Architects, Canfield, Reuter and Martin, it was decided not to enclose the heaters in separate rooms but rather to extend the intake ducts into a crawl space which received outside air from a louver in the wall or roof of the building. Bergeron was directed to fabricate round metal ducts measuring approximately 12 inches in diameter. Each duct was equipped with an attachment to fit over the open end of the ducts furnished by Payne. The extensions were then run approximately five feet to the wall next to each heater. Openings were cut in the walls to admit the ducts into the crawl space. From there the ducts were run to a point near the louver, a distance of approximately 55 feet.
Essentially the heater consists of four basic components. They are (1) a burner assembly or combustion chamber consisting of the burner and a series of hollow metal casings known as heat exchangers; (2) a conditioned air compartment in which air is heated for distribution throughout the area to be heated; (3) an electrically operated fan, and (4) an air intake duct to provide air for combustion. The unit is one known as a gravity flow heater insofar as the flow of combustion air into the burner is concerned. The burner is what is known as an "in shot burner" deriving its name from the fact that gas for combustion is injected into the burner. Combustion air is provided by means of an intake duct which is simply a flat panel attached to one end of the unit by screws. When properly attached the open end of the duct fits flush with the top of the heater leaving an opening approximately four by twenty-four inches for admission of air into the burner. The combustion chamber is separated from the conditioned air chamber by means of an insulated metal plate. Combustion takes place in the burner assembly by projecting the flame inside the hollow heat exchangers thus heating their outer surface. Heated air is produced by the fan drawing room air into the heater, propelling the air over the heated surface of the heat exchangers and thence into a system of distribution ducts. Openings (registers) in the distribution system permit the escape of heated air as desired throughout the building. The area in which air passes over the heat exchangers is known as the conditioned air compartment. At or near the top of the conditioned air compartment is an opening which permits the heated air to enter the distribution ducts. A system of "collection boxes", which are attached to a flue or vent, provides a means of escape for exhaust gases and fumes which are thusly discharged from the combustion chamber through the roof of the building. The flue is equipped with a down draft diverter which prevents drafts or wind gusts from proceeding downward into the combustion chamber. This insures against an adverse gas-air mixture in the burner and also prevents extinguishment of the pilot light *335 which is necessary for automatic operation. On or near the top of the burner assembly is situated a safety switch to sense and control temperature in the combustion chamber. To prevent overheating, this switch is factory set to break the electrical circuit to the gas supply valve and shut off the gas should the temperature in that area exceed 230°. This particular feature is an extra safety device used exclusively by Payne. A bulkhead consisting of an insulated metal panel separates the burner assembly from the conditioned air compartment. At or near the point where the fan blows air out of the conditioned air compartment into the distribution system, is situated a safety device known as a high limit switch. This instrument is set by the manufacturer to stop the flow of gas should the temperature in the conditioned air compartment exceed 250°. The fan is equipped with a pre-set switch which turns the fan on when the temperature in the combustion chamber reaches 110°-120°. Inside the conditioned air compartment is a manual reset switch whose purpose is to react and shut off the gas should the blower or fan cease to function. Gas is furnished the burner assembly by means of an electrically controlled gas valve and a regulator whose purpose is to keep gas pressure constant. Temperature in the building is controlled by a thermostat which electrically activates the gas supply valve to turn the gas on and off to maintain room temperature at the desired level.
The heaters were installed in or about June, 1965. In early to mid September, 1965, construction progressed to the point the building commenced being used as a church. Shortly after occupancy, three service calls concerning the heaters' operations were made by Bergeron's employee, M. P. Bergeron. Between occupancy in September, 1965 and the occurrence of the fire on January 25, 1966, a gas line was extended from the meter furnishing gas to the heaters to an auxiliary building on the church premises. This line was run by the Church's pastor, Rev. Arthur C. Widiger, without a permit contrary to municipal regulations. After the auxiliary line was run, it was checked by the gas company, Gulf States Utilities, and the pressure at the church was found adequate.
For identification, the heaters will be referred to as Unit #1, the one which caught fire, and Unit #2, which was on the opposite side of the building and not involved in the conflagration.
Rev. Widiger's testimony is that shortly after the church was occupied in September, 1965, Unit #2 commenced blowing smoke into the church through the registers. Investigation disclosed in addition that the air intake duct to this unit became hot to the extent it would burn the hand on contact. It was also noted that paint on Unit #2 blistered and the wall was scorched where the duct entered the crawl space. Mr. Bergeron was notified. He dispatched a service man to repair the unit. Subsequently Unit #1 malfunctioned in the same manner. Mr. Bergeron was again summoned and made repairs. On January 16, 1966, Unit #2 began blowing smoke. Rev. Widiger shut off Unit #2 and on January 16, 1966 wrote a letter advising Canfield of the situation. Thereafter, and until the occurrence of the fire several days later, Unit #1 operated apparently without any difficulty. The minister acknowledged having added a gas line to an outbuilding in late October without obtaining a permit for the extension and without checking to see what effect the extension might produce in the gas pressure to the heaters. He recalled nothing regarding the fire except that the weather was extremely cold when the fire occurred.
M. P. Bergeron testified that following final inspection, he made three service calls to check the units. The first call was to check scorching of the wall near Unit #2. He found a cap had become detached from the bottom of the gas regulator allowing gas to escape therefrom and ignite to produce a flame that enveloped the regulator. Later he stated the flame was slightly larger than that produced by a candle. On the second call, he observed *336 the same condition on Unit 2. He shut off Unit 2 and upon his brother's orders, replaced the regulator of this unit with two new regulators furnished by the distributor. His last call involved merely an adjustment of Number 2 Unit's thermostat which was found to be off by 6 degrees. On all three calls he checked Unit #1 and performed no repair thereto because in each instance it was working properly. He emphatically denied ever performing any service work on Unit #1. He found some screws missing from the panel plate on #2 Unit. He did not know whether the regulator fire on Unit 2 could have caused the wall scorching noted in the vicinity of this heater.
T. J. Bergeron, heating subcontractor, testified he extended the intake ducts of the heaters upon Mr. Verges' orders issued as an alternative compliance with Martin's recommendation, and that the entire installation was subsequently approved by both Verges and Martin. After installation, he checked the units in Reuter's presence and found both to be operating properly, including the high limit switch. He verified the three service calls by his brother. In his opinion, the fire at the gas regulator of Unit 2 could have heated the intake duct. He stated the regulator was only about four inches from the gas control valve and that the burning regulator could have heated the gas valve sufficiently to make it malfunction. Bergeron concedes he did not inform Reuter of the problems encountered. He did, however, notify Payne's distributor who suggested equipping unit #2 with two new gas regulators which the distributor provided. Bergeron explained that installation of the gas line extension made by Rev. Widiger would necessitate shutting off the gas and pilot lights in the heaters and relighting the pilot lights by removal of the combustion air ducts. He acknowledged that extension of the line without a permit was in violation of the municipal code. In his opinion, the fire was caused by failure of the high limit switch to operate.
Robert L. Hughes, Senior Design Development Engineer for Payne and holder of patents on the burners and limit switches used in the units in question, explained the operation of the units. He noted that installation instructions which accompany each unit have been approved by the American Gas Association. Each unit, he testified, is manufactured and factory tested in accord with American Gas Association standards and regulations. The units are guaranteed against reverse cycling, a phenomenon hereinafter explained, and also guaranteed to function safely if installed according to instructions. Hughes considered the original plan, to install the heaters openly in the loft, was acceptable. In his opinion, such installation would have posed no problems. He explained that the unit is a gravity flow heater which requires that the intake duct at the top of the heater connect with the same atmospheric pressure zone as the draft hood relief opening. The two openings must be in the same or equal atmospheric pressure zones to insure proper completion of the combustion process. If, for any reason, the air pressure at the intake duct is lower than that at the draft diverter, a reverse flow of gas is created in the combustion chamber causing reverse cycling. He further explained that a lower (negative) intake air pressure causes air to flow out of the burner instead of into it, thus starving the burner of oxygen indispensable to combustion. Consequently, the gas, seeking oxygen to burn, continues to burn in the duct-work which is the source of combustion air. As a result, combustion and heat will occur in the intake air ducts rather than the combustion chamber. When installed as intended, the factory supplied intake duct should remain at room temperature. Hughes stated it was unnecessary to extend the intake duct outside of the room in which the units were located. Extending the intake ducts to the crawl spaces changed a characteristic of the basic unit. In Hughes' opinion, extending the ducts as shown created a negative pressure causing reverse cycling. He explained that since *337 the extended ducts admitted air from a different pressure zone, negative pressure resulted. He also stated that gusts of wind and varying outside air pressure entering the crawl space through the louvers could also affect the air-gas ratio required for normal combustion. It was also his opinion that the fire from the leaking regulator could not produce sufficient heat to either blister the paint on the unit, cause the intake ducts to become too hot to touch, or scorch the walls five feet from the heater. Smoke emitting through the register indicated to Hughes an overheating of the binder separating the burner from the conditioned air chamber. He further asserted that instructions delivered with the units indicate installation must accord with local codes which in turn refer to books or brochures published by the National Warm Air Heating and Air Conditioning Association and the American Society of Heating and Refrigeration and Air Conditioning Engineers. Both latter works allude to the American Standard Installation of Gas Appliances and Gas Piping Code for 1964 which expressly proscribed extension of an intake duct of a gravity flow heater installed in an unconfined area. He expressed the view the Engineer, Reuter, should have known of the Code and the engineering principles involved although Bergeron, the installer, might not reasonably be expected to possess such technical knowledge. Hughes stated the instructions accompanying the units did not expressly prohibit extension of the air intake duct but that its method of manufacture should have indicated to anyone experienced in the field that extension was not intended. Neither Hughes nor any other representative of Payne examined the heaters after the fire. The units were discarded and replaced with another brand before Payne's agents could obtain entry into the church for an inspection. On examination of photographs taken after the fire, Hughes concluded discoloration appearing on the burned unit indicated reverse cycling. It was also Hughes' opinion that burning in the intake duct system during reverse cycling would not activate the high limit switch located near the bulkhead between the conditioned air compartment and the distribution duct. He noted the manual reset switch controlling the blower fan, located in the conditioned air compartment, would not shut off the gas when reverse cycling occurred because this device responds only to a cessation of the blower functioning. He acknowledged that the limit switch on the burner assembly in the combustion compartment would respond to a reverse cycling situation and shut off the gas valve. It was his view that reverse cycling had occurred since initial installation as evidenced by Rev. Widiger's testimony that the intake ducts became extremely hot when the units were in operation. He believed the repeated reverse cycling ultimately fatigued the limit switch in the burner assembly allowing the fire in reverse cycling to go unchecked. It was his further opinion that but for the extra limit switch in the burner assembly (an additional safety device not found on any other heater), the fire would have occurred when the heaters were initially lit. Hughes asserted the heaters are guaranteed against reverse cycling if installed as intended but not when negligently installed or when their basic characteristic is modified or altered. In essence he stated the guarantee cannot apply to an installation so improperly made as to subject the units to constant reverse cycling.
The testimony of Ernest E. Verges is that he engaged Reuter as an independent consulting engineer and relied on Reuter's judgment regarding the heaters. He acknowledged that a percentage of the architect's fee, attributed to the cost of the heating installation, was paid Reuter. Verges also conceded the change in plans for installation of the heaters was made pursuant to Martin's recommendation, and that the decision to extend the ducts was made after consultation between Canfield and Martin.
James V. Reuter, Jr., testified he designed the original heating layout. During *338 construction Martin recommended enclosing the heaters in rooms to prevent depletion of oxygen in the building. He informed Verges of Martin's suggestion. On his final inspection, he noted the ducts had been extended and was advised by Bergeron that the city would accept the extension on the intake ducts in lieu of enclosing the heaters. A check of the system was made November 18, 1965. This check did not include the high limit switch because Bergeron indicated he had already made this particular test and found the switch in order. He stated that inspection of the high limit switch required complete dismantling and reassembly of the heaters. Reuter considered the heaters properly installed in every respect. Extension of the ducts, in Reuter's opinion, did not violate any gas installation code. He was of the view that the heaters would not function properly if the intake ducts were in close proximity to the conditioned air registers because such a condition would produce a negative pressure at the intake ducts. Reuter attributed the fire to either a defective gas valve or a defective high limit switch on Unit #1. Reuter also believed installation of the additional gas line by Rev. Widiger could result in a fluctuation in gas pressure which would affect proper operation of the gas valves on the heaters. He explained that if the gas valves permitted too much gas into the burners, they would overfire. Reuter further explained that a properly designed gas supply system requires consideration of gas pressure decreases resulting from increasing the demand on the system. Addition of lines to a system should be accomplished only after careful balancing by varying pipe sizes, depending upon the distance gas must flow and the amount of gas needed at the points of consumption. He was of the opinion a gas regulator fire as described by Bergeron could heat the intake ducts.
Canfield's testimony is simply that he approved the heating system as installed by Bergeron. He did so upon its acceptance and approval by the Architects and Martin.
H. A. Martin, Chief Air Conditioning and Heating Inspector for the City-Parish Government, acknowledged he approved the duct extensions in lieu of his original recommendation to enclose the heaters. He considered the installation proper. In Martin's opinion, possible causes of the fire were (1) failure of the high limit switch to operate; (2) a malfunction of the gas valve; (3) a malfunction of the blower motor and (4) clogged filters. Martin acknowledged that in a letter written to the Chief of the Fire Prevention Bureau following the fire, he expressed the view the fire could have resulted from a gas leak or the manner in which air was ducted into the heaters. He also stated that installation of the gas line added by Rev. Widiger required a permit.
Glenn H. Baker, a heating systems expert, testified the installation was not faulty. He stated that once a high limit switch is checked, it can usually be expected to continue functioning properly. Subsequently, he qualified this statement by acknowledging he has seen high limit switches fail after having been checked. Smoke emitting from the registers indicated to him that the blower motor was overheating or burning but that such a malfunction would not heat the intake ducts. Malfunctioning of the gas regulator would not produce smoke in the distribution system but would heat the intake ducts. It was his opinion that insufficient oxygen in the combustion air would cause the burner flame to smoke. The smoke, however, should exit through the exhaust vent, not the registers. It was Baker's opinion the fire was caused by failure of the high limit switch.
Odell McPherson, Payne's District Sales Manager, testified that in late January, 1967, he was advised by his home office that Payne had become involved in a lawsuit as a result of the fire. He attempted to gain admission to the church but could not make contact with Rev. Widiger. He was never informed where the units were or what disposition was made of them. *339 Based on Bergeron describing the manner in which the units were installed, McPherson expressed the opinion the duct extensions were in violation of national safety codes. He also explained that a Payne heater is so constructed that normal operation of the in shot burner requires constant gas supply at adequate pressure.
Murvan M. Maxwell, architect, testified that installation was not in violation of the National Fire Code (NFPA 54-1964). He also stated he had installed similar systems with intake ducts to fresh air sources. Addition of the duct, in Maxwell's opinion, would at most create a minimal pressure differential of no significance. He was also of the opinion the intake ducts became heated because the gas supply valve stuck in an open position.
Joseph Leininger, an expert in the mechanical and electrical engineering aspects of heating systems, considered the installations in compliance with all safety standards and regulations. He conceded that reverse cycling was a possible cause of the fire. He believed, however, the immediate cause was failure of a component in the heating unit. He so believed because the remains of the heater indicated intense heat occurred in the unit. He was of the view the intake ducts would have exhibited considerably more damage had the fire resulted from reverse cycling. In his opinion, if reverse cycling were the cause, it should have happened to both units as they were similarly installed. He acknowledged that small pressure changes can cause reverse cycling. He was also of the opinion that if the Payne units are particularly sensitive to pressure changes, installation instructions should have made it perfectly clear that no attachments or extensions be affixed to the air intake ducts. Leininger also stated the duct extensions did not impair the heaters' operation but felt that they might have aided. Leininger had no opinion as to precisely where the fire originated. He believed, however, it started within the heater and was caused by either (1) an over pressure or under pressure of gas into the burner; (2) failure of the regulator; (3) failure of the limit controls, or (4) malfunction of the gas valve.
The doctrine of res ipsa loquitur is a rule of evidence, the applicability of which is determined in each instance at the conclusion of the trial. When applicable, it makes out a prima facie case of negligence on defendant's part and shifts the onus on defendant to show an absence of negligence. The doctrine of res ipsa loquitur, being a qualification of the general rule that negligence is not presumed but must always be affirmatively established, should be sparingly applied only in exceptional cases where the demands of justice make its application essential. Day v. National U. S. Radiator Corporation, 241 La. 288, 128 So.2d 660.
It is settled in our law that the doctrine of res ipsa loquitur applies only when the instrumentality alleged to have caused the damage is in the actual or constructive control of the defendant, or where plaintiff has proved freedom of fault on the part of all through whose hands the instrumentality passed after leaving defendant. Eversmeyer v. Chrysler Corp., La.App., 192 So.2d 845; Brechtel v. Gulf States Elevator Corp., La.App., 195 So.2d 403; West v. Hydro-Test, Inc., La.App., 196 So.2d 598.
Eversmeyer, above, was a suit by a new automobile owner against the manufacturer for damages to the vehicle resulting from a fire which occurred 10 days after his purchase from a local dealer and five weeks after the vehicle left defendant's possession. On leaving the factory, the automobile was handled by a commercial carrier and an independent dealer. Additionally, the vehicle was driven by persons other than the owner and was serviced at gas stations and by the dealer as well. Application of res ipsa loquitur was rejected on the ground that plaintiff made no attempt to show freedom from fault on the part of those through whose hands the car passed after leaving the manufacturer's possession.
*340 Also, the doctrine of res ipsa loquitur has no application where the instrumentality causing the harm has been modified or tampered with after leaving defendant's possession and control. Appropos the case at hand is the following determination made in New Amsterdam Casualty Company v. Redondo, La.App., 225 So. 2d 230:
"Furthermore, the plaintiff cannot invoke this doctrine against this defendant for the additional reason that the dryer had been out of its possession and control for some time and had been exposed to tampering by interfering parties. At least on one occasion the buyer had had trouble with the pilot light and it had been repaired or adjusted by a serviceman. Under such circumstances the doctrine of res ipsa loquitur cannot be invoked against this defendant."
The record establishes that the heaters in question had been modified by addition of the duct extensions. They had also been repaired on more than one occasion according to the minister who himself partly disassembled and reassembled the units to relight the pilot lights.
The testimony of Reuter and T. J. Bergeron shows that the latter checked the high limit switch on each unit. It is also shown that this procedure required disassembling the units in some respects. Additionally, Bergeron modified the units by attaching extensions to the intake ducts measuring approximately 55 feet in length. Reverend Widiger asserted both units malfunctioned by overheating in the intake duct system and blowing smoke through the registers. He also testified Bergeron repaired both units to correct these defects. It is also shown that installation of the auxiliary gas line by the minister necessitated shutting off the gas and relighting of the pilot lights requiring removal of the combustion air ducts. From Reuter's testimony, it is reasonable to conclude the addition of the auxiliary gas line could have adversely affected operation of the gas regulator. The foregoing establishes that control over the units had passed out of the control of defendant Payne.
It is incumbent, therefore, upon plaintiff to establish freedom from negligence on the part of the intervening parties who installed or handled the heaters. Eversmeyer v. Chrysler Corporation, above; New Amsterdam Casualty Company v. Redondo, above.
Mr. Hughes attributed the origin of the fire to the extensions of the intake duct system which produced reverse cycling. Mr. Leininger acknowledged that this was a possible cause of the conflagration. Mr. Martin initially assigned this same reason as a possible cause but subsequently changed his mind. The record does not convince us with reasonable certainty that the duct extensions did not result in the fire.
It cannot be said with reasonable certainty that Bergeron was free of negligence in advising Rev. Widiger the units were in operable condition. Bergeron testified he only repaired Unit #2 and never worked on Unit #1. Rev. Widiger found overheating of the intake ducts of both heaters and observed smoke issuing from the registers. Mr. Baker testified that smoke from the registers would indicate the blower motor was overheating or in the process of some sort of fire, but that a burning gas regulator would not produce smoke through the registers. Since both units were connected to a common distribution system, the smoke noted could have originated from either or both of the units. M. P. Bergeron's testimony is that he did not know whether the burning regulator on Unit #2 could have produced enough heat to scorch the wall. His testimony also indicates he did not fully understand the malfunctioning of heater number 2 which he admitted having repaired.
It is conceded Reverend Widiger installed an unapproved gas line from the church to an outbuilding. Mr. Reuter's testimony shows that the proper design of a gas line system requires consideration of *341 the fact that gas pressures are decreased by the addition of more pipe lines to a gas system. Mr. Reuter also testified the added line could have resulted in fluctuation in gas pressure which would adversely affect operation of the gas valves on the heaters. He also observed that if the gas valves permitted excess gas into the heaters, the heaters would over-fire. According to Reuter, gas pressure fluctuates with temperature changes, therefore, the fact that pressure was checked on a given day and found adequate would not preclude malfunction of the gas valve induced by a new gas line under circumstances differing from those prevailing when the check was made. Under the circumstances, it cannot be said that the record establishes by a preponderance of evidence that addition of the gas line did not impair the operation of the heaters. Neither does the record establish with reasonable certainty that Reverend Widiger properly reassembled the units when he disassembled them to relight the pilot lights after installing the added gas line. It follows that plaintiff has not established freedom from fault on the part of those who had possession and control of the heaters after they left Payne's possession.
Also appropos is the rule that the doctrine of res ipsa loquitur is inapplicable where the cause of the injury may have been brought about by one of two or more causes, with some of which defendant had no causal connection. Bougon v. Traders & General Ins. Co., La.App., 146 So.2d 535. Stated otherwise, res ipsa loquitur is inapplicable unless the circumstances reasonably exclude every other cause of the accident except those attributable to defendant's negligence. Glisson v. Colonial Buick Inc., La.App., 156 So.2d 271. The present record discloses four possible causes of the fire, none of which are included or excluded by a preponderance of evidence. They are: reverse cycling caused by extension of the intake ducts resulting in a negative combustion air pressure; (2) failure of the gas valve or regulator induced by pressure fluctuation resulting from installation of the auxiliary line added by Reverend Widiger; (3) failure of a component of the heaters such as the gas valve, regulator or one of the safety devices, including the high limit switch, due to faulty manufacture, and (4) Bergeron's failure to make a thorough and proper investigation of the cause of the malfunctioning noted before the fire.
Excepting only those cases when res ipsa loquitur is applicable, negligence is never presumed and the burden rests upon plaintiff to prove defendant's alleged negligence. Mayes v. McKeithen, La.App., 213 So.2d 340. The mere possibility that defendant's conduct caused a fire is not sufficient to make out plaintiff's case. Courts may not render judgments on the basis of mere speculation, probability, possibility or conjecture. Schulingkamp v. Bolton Ford, Inc., et al., La.App., 163 So.2d 161.
Plaintiff must prove his case by a clear preponderance of evidence, which means plaintiff need only show it is more probable than not that defendant's negligence was the cause of the harm, damage or injury inflicted. Perkins v. Texas and New Orleans Railroad Company, 243 La. 829, 147 So.2d 646. Causation may be proved by circumstantial evidence which need not necessarily exclude all other possible causes. Naquin v. Marquette Casualty Company, 244 La. 569, 153 So.2d 395. Mere proof that something is possible is of little probative value as to an ultimate issue of fact, unless it be established with reasonable certainty that all other alternatives are impossible. Bogasky v. Falsetta, La.App., 189 So.2d 98.
Here the phenomenon of reverse cycling is more than a mere possibility. Units #1 and #2 malfunctioned on separate occasions by emitting smoke through the registers and overheating the intake ducts, according to Reverend Widiger. Contrarily, T. J. Bergeron maintains Unit #1 never malfunctioned. According to Baker, malfunctioning of the gas valve on Unit #2 would not produce smoke from the registers. M. P. Bergeron, who repaired heater *342 #2, was not certain the flame from the gas regulator failure could have scorched the wall five feet away. It appears extremely doubtful that the regulator fire scorched the wall in view of M. P. Bergeron's testimony that the flame thus produced was slightly larger than a candle flame.
Assuming Unit #1 never malfunctioned, as testified by T. J. Bergeron, reverse cycling appears to be the only circumstance which accounts for the smoking through the registers, the intense heating of the intake duct on heater #2, and the scorching of the wall near that same unit. It is conceded that the units were so similarly installed that if reverse cycling occurred in one, it was extremely probable it would occur in the other. In this respect, Mr. Hughes testified that from examination of photographs taken after the fire, he found a discoloration pattern on Unit #1 which was consistent only with the occurrence of reverse cycling. It will be recalled that Hughes was of the opinion that reverse cycling was the cause of the fire. In Leininger's opinion, reverse cycling was a possible cause and Martin was at one time of the opinion that reverse cycling was a possible cause.
We find from the evidence that failure of the gas valve or regulator on heater #1, induced by addition of the gas line installed by Reverend Widiger, is more than a mere possible cause of the fire. Martin's testimony establishes that such an installation requires a permit which was not obtained. The previously analyzed testimony of Mr. Reuter shows reasonably probable causal connection between the addition of the unauthorized line and the ensuing fire. In this regard, we recall that Mr. McPherson testified the heater was so constructed it would operate normally only under a constant gas supply at adequate pressure.
Faulty manufacture of the gas valve, regulator and safety devices, including the high limit switch, cannot be excluded as possible causes of the fire. Mr. Leininger observed the effect of intense heat inside the conditioned air chamber. The high limit switch located in this area should have shut off the burner when the temperature reached 250, yet it did not. It is evident that the high limit switch either malfunctioned by failing to signal the gas valve, or that the signal was sent but that the gas valve did not respond because it was "stuck open" and not subject to control by the high limit switch. The high limit switch was checked by T. J. Bergeron after installation and found working. Mr. Bergeron testified that once the switch is found operating it is unlikely to malfunction. Still Bergeron and Baker attributed the fire to failure of the high limit switch on Unit #1. Both Leininger and Reuter conceded such a failure could have caused the fire.
It is more than a mere possibility that had T. J. Bergeron thoroughly investigated the cause of the smoke emitting from registers and the source of the heat in the intake ducts, the precise cause of the difficulty may have been discovered and corrected. It may well be that under the circumstances, he was charged with the duty of further investigation or the affirmative duty to seek expert advice if he could not cope with the condition found. His testimony, however, is that in each instance he left the units functioning properly after making repairs.
We find, therefore, that plaintiff has failed to establish the cause in fact of the fire by that preponderance of evidence required by law. Stated otherwise, plaintiff has not established that any particular one of the four possible and probable causes shown more probably than not caused the fire.
Our denial of application of res ipsa loquitur herein because plaintiff failed to show freedom from fault, to a reasonable certainty, on the part of all parties having control of the heaters after they passed from Payne's control, does not mean defendants' negligence has been established with reasonable certainty. This *343 holding does not relieve plaintiff of the burden of establishing negligence as required by law. On the contrary, we find that the several possible causes in fact are established with equal probability, but no one is shown by that preponderance which the law demands. Plaintiff, therefore, has not discharged the burden of proof. It is significant that one of the equally probable causes would establish contributory negligence attributable to plaintiff and would therefore bar plaintiff's recovery. In such circumstances, plaintiff cannot prevail.
The judgment of the trial court is reversed and judgment rendered herein rejecting plaintiffs' demands against all defendants.
Judgment is also rendered rejecting all third party and incidental demands. All costs in the trial court and on appeal to be paid by plaintiff, Lutheran Benevolent Association.
Reversed and rendered.