486 So.2d 144 (1986)
Anne Shirley THOMPSON, et al., Plaintiffs-Appellees,
v.
Lloyd H. TUGGLE, et al., Defendants-Appellants.
No. 84-856.
Court of Appeal of Louisiana, Third Circuit.
March 18, 1986.
Rehearing Denied April 15, 1986.
Writ Denied June 13, 1986.
*146 Phillip L. McIntosh, Monroe, of Snelling, Breard, Sartor, Inabnett & Trascher, for defendants-appellants.
Russell T. Tritico, Raggio, Cappel, Chozen & Berniard, Paul Foreman, Lake Charles, for plaintiffs-appellees.
Before DOMENGEAUX, GUIDRY, FORET, STOKER and KNOLL, JJ.
KNOLL, Judge.
In this products liability case, one of the defendants, Beard-Poulan Division of Emerson Electric Company (Poulan), appeals the trial court's judgment awarding the widow and daughter of Howard Thompson (plaintiffs) $245,800 and $10,000 respectively for his wrongful death, which occurred when the Poulan Model 4200 bow blade chain saw he was using kicked back into his neck and severed his jugular vein. The plaintiffs also brought this action against Lloyd Tuggle, who was the senior vice-president in charge of engineering for Poulan and was responsible for the design and development of the bow saw in question. The trial court dismissed plaintiffs' claim against Tuggle, finding that Poulan's decision to forego the installation of chain brakes on chain saws sold in this country was a marketing decision, not an engineering decision, for which Tuggle was not responsible. In answer to the appeal, plaintiffs do not question this determination, but ask for an increase in damages.
Georgia Casualty & Surety Company intervened to recover workmen's compensation benefits it paid to plaintiffs. All parties stipulated that it was entitled to $30,277.15 to be paid in preference out of any award made to plaintiffs; the trial court entered judgment accordingly.
Plaintiffs' claim against Poulan is based on negligence and, in the alternative, strict liability. Plaintiffs contend that the chain saw was defective because it was not equipped with a chain brake, and further, that the manufacturer failed to adequately warn of the dangers associated with kickback. Plaintiffs answer the appeal, seeking an increase in damages.
Poulan contends on appeal that the trial court erred in finding that: (1) Thompson's fatal injuries were caused by kickback of his saw and that a chain brake, which Poulan negligently failed to incorporate in its chain saw design, would have been effective in preventing the fatality; (2) the kickback phenomenon is a defect which renders chain saws unreasonably dangerous; (3) Poulan had a duty to warn Thompson of the dangers associated with kickback, and that Poulan's warnings were inadequate; and (4) Thompson was guilty of neither contributory negligence nor assumption of the risk.
We amend to increase quantum and, as amended, affirm, finding no manifest error in the trial court's determinations.

FACTS
Howard Thompson, 57 years of age, was a part-time professional pulpwood cutter with approximately five years experience. He was also a full-time employee of the Many Police Department where he worked from midnight until 8:00 a.m. Upon completion of his shift, he cut pulpwood for six to seven hours. This had been his routine for the past five years. Prior to the accident, Thompson had been using a power bow saw for at least four years.
On April 7, 1981, Thompson worked the midnight to 8:00 a.m. shift with the police department and then went home. Shortly thereafter, he left his home, picked up his wood stacker, Isiah Lynch, and went to a wood yard in Fisher, Louisiana, where he trimmed a load of pulpwood using a Model 4200 Poulan chain saw equipped with a bow guide; the pulpwood logs were too long to be accepted by the wood yard and, therefore, had to be trimmed. Thompson and Lynch then went to the woods to trim another load of wood. In both instances, the logs were trimmed while loaded on the pulpwood truck.
*147 Using his truck, Thompson lowered the tailgate of his pickup truck and backed up to the pulpwood truck so that the trucks were positioned end to end, approximately 2 to 2½ feet apart. He then positioned himself on the tailgate of his pickup truck to begin cutting.
Thompson instructed Lynch to pick up the blocks of wood that fell to the ground as he trimmed the logs. There were wood blocks on the ground when they arrived so Lynch began to pick them up. When Thompson started his chain saw, Lynch noticed that the cap for the oil tank was off and oil was spilling. Thompson turned the saw off, got off of the tailgate, wiped the oil he had spilled, put sawdust on the tailgate where he had spilled oil, refilled the oil reservoir and replaced the cap. He then got back on the tailgate, on the passenger side of the pulpwood truck and the driver's side of his pickup truck, and restarted the bow saw. He proceeded to trim the logs, standing with his left leg on the bed of the pickup truck and his right leg extended forward with his right foot on the right rear dual tires of the pulpwood truck. The exact position of the bow saw while Thompson was trimming the pulpwood is not established by the evidence; however, the saw had to be extended forward in order for him to trim the logs in front of him.
Lynch was picking up blocks on the same side of the trucks where Thompson was trimming logs. When he realized that no blocks were falling to the ground, Lynch looked up and observed Thompson standing with his left hand over his eyes and the bow saw, still running, in his right hand. Blood was spurting from Thompson's neck. As Thompson began to fall, Lynch ran to call Lloyd Savell, the pulpwood contractor who employed Thompson. When Savell saw Thompson, Thompson was beginning to fall. His body was sagging and beginning to tilt. At first Savell thought Thompson was going to squat or sit down. Instead Thompson fell forward against the back stake of the pulpwood truck and slid down. He then fell to the ground and rolled over onto his back. Savell ran to Thompson, picked up one of his legs, moved the saw that was idling and turned the engine off. Apparently no one witnessed the chain saw make contact with Thompson's body. He was cut from his left ear to his right collar bone, severing the jugular vein. He died before the ambulance arrived.

CAUSATION
The burden of proving causation in products liability cases was clearly stated in DeBattista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981) as follows:

"[The] plaintiffs' burden is to prove causation by a preponderance of the evidence. This burden may be met either by direct or, as in this case, by circumstantial evidence. Jordan v. Travelers Ins. Co., 257 La.995, 245 So.2d 151 (1971); Naquin v. Marquette Cas. Co., 244 La.569, 153 So.2d 395 (1963).

Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes. Otherwise, the mere identification by the record of another possibility, although not shown to be causally active, would break the chain of causation. Weber v. Fidelity & Cas. Ins. Co. of N.Y., 259 La.599, 608-09, 250 So.2d 754, 757 (1971)."

When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for its findings, a reviewing court should not disturb this factual finding in the absence of manifest error. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). The cause-in-fact of an injury is a factual question and the trial court's determination will not be disturbed unless it is manifestly erroneous. Prudhomme v. Nationwide Mut. Ins. Co., 465 So.2d 141 (La. App. 3rd Cir.1985), writ denied, 467 So.2d 1132 (La.1985).
In the instant case the trial court found that Thompson's fatal injury was *148 caused by kickback, which occurred when the bow saw came into contact with a log behind the log he was trimming at the time. Poulan objects to this finding on the basis that there was no direct evidence that kickback caused the injury. It is well settled that the plaintiffs may meet their burden of proof by circumstantial evidence. DeBattista, supra. Because no one witnessed the bow saw come into contact with Thompson's body or what caused it, the trial court carefully and conscientiously analyzed the testimonies of the persons who immediately responded to the accident: Isiah Lynch, his wood stacker, testified that Thompson was in a standing position and had cut several pieces of wood on the lower side of the pulpwood truck just prior to the accident; Lloyd Savell, his employer, testified that he observed the location of the last log Thompson cut and that it was about even with Thompson's face; and Michael Jones, the emergency medical technician who investigated the accident, observed the fresh cut mark on the last log Thompson began cutting and its approximate location, and further observed Thompson's partial shoe print on the right rear dual wheel of the pulpwood truck. In addressing various other theories of causation proposed by Poulan, the trial court methodically stated:
"Defendants' counsel suggests several other possible causes of Thompson's fatal injury, all unrealted [sic] to any kick-back action by the bow saw. He suggests that Thompson was off-balance while operating the saw on this occasion, due to the alleged over extension [sic] of his right leg which was necessary for him to get the saw in contact with the pulpwood he was trimming and was unable to sufficiently control the saw, which was operating normally, resulting in the saw striking his body; that Thompson was holding the saw up at an excessive height while trimming the pulpwood, resulting in his inability to maintain proper control of the saw, which was operating normally, that Thompson's alleged fatigue, resulting from his having worked as a policeman the previous night hours caused him to lose control of the chain saw, resulting in the fatal injury to him. If, as suggested, Thompson's body was off-balance or unbalanced while he was trimming the pulpwood it seems to me that he would have fallen while he was in such an off-balance or unbalanced position, rather than from a standing, flat-footed position as Isaiah Lynch testified. It does not seem very likely that Thompson could have been able to come to that body position before falling had he been in an off-balance or unbalanced position while trimming the pulpwood. Nor does it seem likely, from the available evidence, that Thompson was operating the saw at an excessive height, causing him to lose control of the saw. When Isaiah Lynch saw Thompson, just before he fell from the pickup truck, Thompson was holding the saw down by his side. This does not indicate either that Thompson dropped the saw on his neck during its normal operation or that Thompson dropped the saw and then fell on it. I see no other way the saw could have come in contact with Thompson's neck other than through Thompson dropping the saw on his neck or falling on the saw after dropping it, if it is assumed that no kick-back of the saw occurred.

The likelihood of Thompson being in an off-balance or unbalanced position while trimming the pulpwood or operating the saw at an excessive height for proper control of the saw is further discounted by the testimony of Mike Jones, who is an emergency medical technician and Chief of Police of the Town of Florien, and responded to the call for assistance in the accident. He also simulated Thompson's position and had no problem with his balance when his feet were placed in the same position of Thompson's while he was trimming the pulpwood logs. (See Transcript, Pp. 91-93.). *149 Thompson's fatal injury occurred only a short while after he began his work-day as a wood cutter. Thus, even though he had just completed a shift as a policeman, it does not seem likely to me that he was fatigued at the time of the accident. Thompson had held down both these jobs for some time and there is no evidence that his performance as a wood cutter suffered from his dual employment. Thus, it seems much more likely that Thompson's fatal accident was caused by the kick-back of the saw, instead of the other non-kick-back related causes suggested by counsel for defendants."

The record clearly supports the trial court did not manifestly err in its factual determinations. We, therefore, conclude that Thompson's fatal injury was caused by kickback.

DEFECT IN DESIGN
Poulan contends that kickback does not render a saw unreasonably dangerous to normal use, and further, that its failure to install a chain brake did not constitute a defect because a chain brake would not have prevented Thompson's fatal injury. Poulan further contends that the trial court erred in disregarding its expert testimony and various studies which indicate that chain brakes are not effective.
Lanclos v. Rockwell International Corp., 470 So.2d 924 (La.App. 3rd Cir. 1985), writ denied, 477 So.2d 87 (La.1985), sets forth Louisiana law of negligence and strict liability in products liability cases as follows:

"A manufacturer of a product may be held liable for injuries caused by their product, without any particular act of negligence being proven, if a plaintiff shows: (1) that the product was in normal use; (2) there was a defect in the product, i.e., the product was unreasonably dangerous in that use; and (3) that the plaintiff's injuries were caused by the defect. Defenses to a products liability claim include the negative of any of the three items above plus plaintiff's assumption of the risk. Oatis v. Catalytic, Inc., 433 So.2d 328 (La.App. 3rd Cir.1983), writs denied, 441 So.2d 210 and 441 So.2d 215; Weber v. Fidelity & Casualty Insurance Company of N.Y., 259 La.599, 250 So.2d 754 (La. 1971).

If the product is proven defective by reason of its hazard to normal use, the plaintiff does not need to prove any particular negligence by the manufacturer. Weber, supra, 250 So.2d at 756.

`Unreasonably dangerous' means simply that the article which injured the plaintiff was dangerous to an extent beyond that which would be contemplated by an ordinary consumer. De Battista v. Argonaut-Southwest Ins. Co., 403 So.2d 26 (La.1981). Even though use of the term `unreasonably dangerous' serves to prevent the manufacturer from being treated as an insurer of its products, that term does not burden the injured plaintiff with proof of an element of negligence. DeBattista, supra, at 31.

In Entrevia v. Hood, 427 So.2d 1146 (La.1983), the Supreme Court stated:
`The unreasonable risk of harm criterion, however, is not a simple rule of law which may be applied mechanically to the facts of a case. It is a concept employed by this court to symbolize the judicial process required by the civil code.
* * * * * *

As this court has noted in relation to other forms of strict liability under the civil code, the activities of man for which he may be liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk and the gravity of harm, and a consideration of individual and societal rights and obligations. Langlois v. Allied Chemical Corporation, 258 La.1067, 1084, 249 So.2d 133, 140 (1971).

The judicial process involved in deciding whether a risk is unreasonable under *150 Article 2317 is similar to that employed in determining whether a risk is unreasonable in a traditional negligence problem, Hunt v. City Stores Inc., 387 So.2d 585 (La.1980), and in deciding the scope of duty or legal cause under the duty/risk analysis. Hill v. Lundin Associates, Inc., 260 La.542, 256 So.2d 620 (1972); Green, The Causal Relation Issue, 60 Mich.L.Rev. 543, 563 (1962). This is not because strict liability under Article 2317 is equivalent to liability for negligence, but because in both delictual areas the judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social, and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community. B. Cardozo, The Nature of the Judicial Process, at p. 105 (1921); See also, Green, The Causal Relation Issue, 60 Mich.L.Rev. 543 (1962).'

* * * * * *

A design that presents unreasonable hazards within the range of the equipment's forseeable uses imposes an additional duty on the designer-manufacturer to provide adequate guards against those hazards. Straley v. Calongne Drayage & Storage, Inc., 346 So.2d 171 (La.1977)."

The issue of defective design is factual and depends on the circumstances of each case. Nailor v. International Harvester Co., 430 So.2d 784 (La.App. 5th Cir.1983), writ denied, 437 So.2d 1148 (La.1983).
It is undisputed that kickback occurs in the normal use of chain saws, despite various anti-kickback devices that Poulan and other manufacturers incorporate into their saws. The trial court in the instant case found that Poulan's chain saws are defective because the kickback phenomenon renders the saw unreasonably dangerous to normal use. The danger is obvious, especially to professional woodcutters, most of whom have experienced kickback on several occasions. We find Poulan's bow saw was defectively designed, not because of the kickback phenomenon, but because of Poulan's failure to provide a safety device, i.e., the chain brake.
The record shows that a chain brake is standard equipment on all McCulloch chain saws sold in this country and abroad. It is only an option on Poulan chain saws sold in this country but is standard equipment on Poulan saws sold in European countries. Experts for Poulan testified that the chain brake does not stop the movement of the chain in sufficient time to prevent injury, that the chain brake will not stand up to the hostile environment to which chain saws are generally exposed, and that its promoting or advertising the chain brake would lull the users of chain saws into a false sense of security. Plaintiffs' experts testified that a chain brake would have prevented, or at least minimized, Thompson's injury. Where the testimony of the expert witnesses differs, it is largely a matter of fact for the trier of fact to determine the most credible evidence, and such finding will not be disturbed on appeal unless manifest error appears in the record. Nailor v. International Harvester Co., supra. We find the record supports the trial court's finding that a chain brake would have prevented Thompson's fatal injury; therefore, we conclude that the defective design which caused Thompson's death was Poulan's failure to incorporate a chain brake in the design of the bow saw.

DUTY TO WARN
Poulan contends the trial court erred in finding that Poulan had a duty to warn of kickback dangers, even though professional woodcutters are the usual purchasers of bow saws, and further erred in concluding that Poulan's warnings were inadequate.
Under Louisiana law, a manufacturer of a potentially dangerous instrumentality such as a chain saw has a duty to instruct reasonably forseeable users of their product with regard to its safe use. Poland v. Beaird-Poulan, 483 F.Supp. 1256 (W.D.La.1980); Williams v. Allied Chemical Corporation, 270 So.2d 157 (La. *151 App. 1st Cir.1972), writs refused, 271 So.2d 875 (La.1973).
In the instant case, Poulan introduced into evidence the owner's manual for the Model 4200 bow saw. The manual provides in pertinent part:
"Guard against kickback. Kickback is the upward motion of the guide bar which occurs when the saw chain at the nose of the guide bar contacts an object. Kickback can lead to dangerous loss of control of the chain saw.

TO AVOID KICKBACK:

Hold the chain saw firmly with both hands. Don't over reach. Don't let the nose of the guide bar contact a log, branch, ground or any other obstruction. Cut at high engine speeds. Don't cut above shoulder height. Follow manufacturer's sharpening and maintenance instructions for the saw chain."
The trial court found the aforementioned warnings inadequate under the circumstances, and explained:
"Since kickbacks apparently cannot be eliminated with the technology presently available to the chain saw industry, and defendants have chosen not to install chain brakes on all their saws, the duty to warn of kickback dangers exists, even though professional wood cutters are the usual purchasers of bow saws. The evidence shows that even with the exercise of due diligence by saw operators and their knowledge of the kickback phenomenon, they still occur. The warnings prepared by defendants seem to create the impression that kickbacks can be eliminated or controlled by the saw operator. This is not very realistic in view of the evidence that kickbacks are practically inevitable. Nor do they seriously convey the message that kickbacks can cause serious injury or death. Moreover, the omission of the warnings in the bow guide kit purchased at random, over the counter, in Lake Charles raises serious doubts that they will be received by the purchasers of these kits, or that they were received by Thompson when he purchased his bow guide kit. Thus, it cannot be assumed that Thompson even received these inadequate warnings."
We find the record supports the trial court's conclusion that kickbacks are practically inevitable. However, we need not consider Poulan's argument that the warnings were adequate since we find the absence of a chain break rendered the bow saw defective, therefore, Poulan is liable. In accord see Corrine Nicholas v. Homelite Corporation, 780 F.2d 1150 (5th Cir. 1986).

DEFENSES
Poulan contends that Thompson voluntarily assumed the risk of injury, and was contributorily negligent. The trial judge concluded that the defense of assumption of the risk was inapplicable because, although Thompson was aware that chain saws can kick back, he did not have full knowledge of the magnitude of the risks and dangers of kickback.
Assumption of the risk is a question of fact determined by an evaluation of the plaintiff's subjective knowledge in each case. The proof required for the application of the assumption of the risk defense consists of three elements: (1) the plaintiff must have actual knowledge of the dangerous condition; (2) there must be appreciation of its dangerous quality; and (3) there must be a voluntary assumption of the danger. Dorry v. Lafleur, 399 So.2d 559 (La.1981). The defendants bear the burden of proving the defense of assumption of the risk. McInnis v. Fireman's Fund Ins. Co., 322 So.2d 155 (La.1975).
Poulan argues that as a professional woodcutter, Thompson must have known of the dangers of kickback, including the risk of serious injury when the saw is improperly used to cut stacked pulpwood logs.
We find no manifest error in trial court rejecting the defense of assumption of the risk. Further, the record shows that Poulan failed to prove that Thompson had *152 actual knowledge of a potentially fatal condition. The record preponderates that Thompson's use of the chain saw was reasonable.
Poulan next contends that the trial court erred in failing to find Thompson contributorily negligent.
In Bell v. Jet Wheel Blast, Div. of Ervin Ind., 462 So.2d 166 (La.1985), the Supreme Court rejected the defense of contributory negligence as a complete bar in products liability cases, and allowed a reduction of plaintiff's recovery in certain cases. This holding was reaffirmed in Lanclos, supra. Whether a plaintiff's recovery should be reduced in a products liability case is decided on a case by case basis. McCaskill v. Welch, 463 So.2d 942 (La.App. 3rd Cir.1985), writ denied, 466 So.2d 469 (La.1985).
In analyzing the facts of the case sub judice, even if we would have found Thompson contributorily negligent, in light of Bell, we find that no useful social purpose would be served by reducing plaintiffs' recovery. It is clear that other professional woodcutters are aware of the hazards associated with the use of the saw. Furthermore, it is clear that a reduction in plaintiffs' recovery would only reduce the manufacturer's incentive to market a safer saw.
Thompson's use of the saw was as an integral part of his day to day work. His use of the saw was repetitive, and in field conditions, which were less than ideal. Therefore, we find no error in the trial court's rejection of this defense.

QUANTUM
In their answer to this appeal Anne Shirley Thompson and Kallye Ann Thompson (plaintiffs) contend the trial court's damage award of $255,800 is inadequate. Poulan argues that the trial court's award is within its sound discretion.
It is well established that before an appellate court can disturb a trial court's award of damages, the record must clearly show that the trier of fact abused its discretion. Coco v. Winston Induatries, Inc., 341 So.2d 332 (La.1976). In Coco the Supreme Court stated:
"Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. [citations omitted] It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
To properly determine whether a quantum award can be upheld revolves around a determination of whether the facts and circumstances peculiar to this case and these individuals reasonably support the trial judge's choice. Schexnayder v. Carpenter, 346 So.2d 196 (La.1977).
In the present case the trial judge itemized his award of damages, as follows:

 "Loss of wages, past & future $220,800
 Anne Thompsons loss of love,
 affection & companionship 25,000
 Kellye Thompson's loss of love,
 affection & companionship 10,000"

Additionally, Georgia Casualty, the workmen's compensation carrier, was recognized as being entitled to reimbursement from Anne and Kallye Thompson for $30,277.15. Therefore Anne and Kallye Thompson realized $225,522.85 from the damage award. The trial court's award of loss of wages, past and future, is not questioned. After examining the record we conclude that the trial judge's awards in general damages to Anne and Kallye Thompson constituted an abuse of discretion.
The record reflects an extremely close family relationship between the decedent, his wife of 37 years, Anne, and their adopted daughter, Kallye. Though Kallye was 19 years of age at the time of her father's death, she lived at home and had a *153 closer relationship with her father than with her mother. The family worked hard together, and especially enjoyed each other's company attending church, fishing and playing baseball.
In making damage awards to spouses we have traditionally looked to the closeness of their relationship, and we particularly have considered whether the spouses legally separated at any time during their marriage. See Meche v. Gulf States Utilities Co., 444 So.2d 137 (La.App. 3rd Cir.1983); Faulk v. Schlumberger Well Services, 412 So.2d 162 (La.App. 3rd Cir.1982); Hardy v. State, Through Dept. of Highways, 404 So.2d 981 (La.App. 3rd Cir.1981), writs denied, 407 So.2d 741 (La. 1981). There was no evidence of a separation at any time during this marriage. Accordingly, we conclude that considering the loving relationship Anne had with her husband of 37 years, $50,000 was the lowest amount within the discretion afforded the trial court which Anne Thompson could have received. Likewise Kallye had a close relationship with her father, and, although she held a full time job, chose to live at home with her family. Under these circumstances we conclude that $20,000 was the lowest amount Kallye could have received.

DECREE
For the foregoing reasons, the judgment of the trial court is amended to increase the awards for loss of love and affection to $50,000 for Anne Shirley Thompson, and $20,000 for Kallye Ann Thompson, together with legal interest from the date of judicial demand until paid. In all other respects the judgment of the trial court is affirmed. Costs of this appeal are assessed against Beard-Poulan Division of Emerson Electric Company.
AMENDED, AND AFFIRMED AS AMENDED AND RENDERED.
STOKER, J., dissents and will assign reasons.
DOMENGEAUX, J., dissents for the reasons assigned by STOKER, J.
STOKER, Judge, dissenting.
I respectfully dissent from the holding of the majority in this case. In my opinion the majority has failed to clear the first hurdle before liability may be found and imposed. The majority fails to make a valid cause-in-fact finding between an alleged defect in the chain saw in question and the deceased's fatal injury. This essential predicate, which we discuss at some length later, cannot be found in this case for the basic reason that no one knows how the accident happened. No one saw the deceased get hurt. Without question circumstantial evidence shows that the deceased was severely injured as described by the majority. Clearly, the saw came into contact with the deceased's body, including the area of his neck where his jugular vein was located.
The error of the majority (and the trial court) consists of assuming causation in more than one particular and focusing solely on the technology of chain saws for the purpose of identifying products liability-type "defects" and warning duties which might be legally owed.
On the question of causation, even the trial judge candidly admitted that he did not know how the accident occurred. He did not make a finding of fact based on the more probable than not test of Jordan v. Travelers Insurance Company, 245 So.2d 151 (La.1971). Rather, the trial judge, with commendable candor, moved straight into a conclusion based upon speculation and conjecture. His very words were "from the available evidence, it seems to me that the most likely cause of Thompson's fatal injury was...." Use of the words "it seems to me" and "the most likely cause" is language of pure speculation and conjecture exactly what judges instruct juries they may not engage in.
The full pertinent portion of the trial court's language from its reasons for judgment from which the words quoted above are taken read as follows:
"When next observed by Isaiah Lynch, Thompson had one hand over his eye and *154 the bow saw in his other hand, bow down, in the pickup truck bed, with the saw running. Thompson then slumped and fell from the pickup bed onto the ground. Blood was seen to spurt from his neck and he later died from the loss of blood which resulted from the severing of his jugular vein. Apparently, no one observed the cutting chain of the bow saw make contact with Thompson's body or what actually caused the saw to come in contact with his body. However, from the available evidence, it seems to me that the most likely cause of Thompson's fatal injury was the kick-back of the bow of the saw and the attached cutting chain when the upper part of the bow and chain came into contact with a pulpwood log behind the log being trimmed at the time, causing the bow and chain to buck or kick upward and rotate back, at high speed, towards Thompson's body, striking his neck and cutting the jugular vein."
After reciting the above, the trial court attempted to support its conjectures with facts purporting to supply circumstantial proof that some shortcomings in the chain saw were the cause of the injury. I submit that the evidence does not establish on a more probable than not basis that deficiencies in the saw caused the injuries and death.
I gather that some members of the majority resolved the close issues of this case on the basis of the manifest error rule, being willing to accept the trial judge's speculations as not being clearly wrong. With respect, I consider the majority erred. I submit that the trial court was quite clearly wrongthe trial court's decision stands on pure speculation and conjecture with respect to causation. No cause-in-fact was proved by plaintiffs and for that reason I respectfully dissent. Because I so thoroughly disagree with the majority opinion, I will set forth my views here in considerable length.

HISTORY OF THE CASE
This is a products liability case. Howard Thompson was killed when the Poulan chain saw he was using came in contact with his neck and severed his jugular vein. The saw at issue is a Model 4200 Poulan chain saw equipped with a bow guide. His widow, Mrs. Anne Shirley Thompson, and his daughter, Kallye Anne Thompson, seek recovery for the deceased's wrongful death. The defendants are Emerson Electric Co., Beard-Poulan/Weed Eater Division (Poulan), the maker of the saw Thompson was using at the time of his death, and Lloyd Tuggle, the senior vice-president of Poulan.
The claim against Poulan is based on both strict liability and negligence.
Plaintiffs-appellees claim that the chain saw was defective because it was not equipped with a chain brake and that the manufacturer failed to adequately warn of the dangers of kickback. Kickback is an abrupt thrusting back of the cutting edge of the chain saw which can occur in certain circumstances. The claim against Tuggle which was based on negligence asserted that Tuggle, as the designer of the saw, had not exercised reasonable care when he failed to incorporate a chain brake into the design of the Model 4200 Poulan chain saw.
Georgia Casualty & Surety Company intervened in order to recover workmen's compensation payments from any award rendered in favor of plaintiffs.
The trial court dismissed the claims against Lloyd Tuggle, and plaintiffs have abandoned their appeal as to that defendant. The judge granted an award in favor of plaintiffs on their claims against Poulan, awarding $245,800 with legal interest to Mrs. Anne Shirley Thompson and $10,000 with legal interest to Kallye Anne Thompson. The court, without objection from any party, amended the judgment to award $30,277.15 to intervenor in preference to and out of the awards rendered in favor of plaintiffs.
In written reasons for judgment, the court found: (1) that Thompson's death was caused by the kickback of his chain saw; (2) that although it is technically impossible *155 to eliminate kickback, which occurs in normal use of a chain saw, the phenomenon of kickback is a defect that renders the saw unreasonably dangerous; (3) that a chain brake is an effective and reliable safety device which was available for use on Thompson's saw; (4) that Thompson's use of the saw was normal or was a use which could reasonably have been anticipated by Poulan; (5) that a chain brake would have prevented the fatality had one been on the saw at the time of the accident; and (6) that the warnings accompanying the chain saw did not adequately warn Thompson, an experienced professional woodcutter, of the dangers of kickback. Defendant-appellant-Poulan appeals seeking to reverse the trial court's judgment. Plaintiffs-appellees seek to have the judgment increased. I believe the majority has incorrectly affirmed the trial court's decision imposing liability on Poulan because that decision is based on manifest error. The judgment of the lower court is not supported by the record.

FACTS
Howard Thompson was fifty-seven years old at the time of his accidental death. He was a fulltime employee of the Many Police Department where he worked the eight-hour shift from 12 midnight to 8:00 a.m. Upon completion of his shift he would go into the woods where he would cut pulpwood for 6 or 7 hours. He was an experienced professional pulpwood cutter and had been working in that field for about 5 years. At least 4 to 4½ years were spent using a power bow saw.
On the morning of the accident, April 7, 1981, Thompson arrived home from his job with the police department. Shortly after 8:00 a.m. he left his home, picked up his stacker, Isaiah Lynch, and went to the wood yard at Fisher where he did some work. Thereafter, Thompson and Lynch went to the woods and upon arrival were told by Lloyd Savell that a load needed trimming. Some of the logs on the pulpwood truck were too long to be accepted by the wood yard, therefore they needed to be trimmed to the required length.
The two men walked around the pulpwood truck and examined the load to see which logs needed to be trimmed. Finally, Thompson opened the tailgate of his pickup and backed up to the pulpwood truck so that the trucks were positioned end to end. The pickup was about 2-2½ feet from the pulpwood truck. Thompson climbed up on the tailgate of his pickup to do the cutting.
Thompson told Lynch to pick up the blocks of wood which would fall as the logs were trimmed and throw them into his pickup. Some blocks were already on the ground when they arrived, and Lynch began to pick them up. When Thompson started his chain saw Lynch noticed that the cap had come off of the saw's oil tank and oil was spilling out. Lynch informed Thompson of this and he turned the saw off. Thompson refilled the oil reservoir and replaced the cap. He wiped himself off and tossed sawdust on the spilled oil. He then restarted the saw.
Lynch was standing on the passenger side of the pulpwood truck and the driver's side of the pickup, toward the back of the load of wood. This was the same side which Thompson was attempting to trim. Lynch saw absolutely no part of the accident even though he was practically in front of Thompson because he was picking the blocks up off of the ground. When he realized nothing was falling to the ground, he looked up to see Thompson standing with both feet on the tailgate of the pickup truck, leaning on his saw, with his right hand gripping the saw handle and his left hand over his eyes. Blood was coming from his neck, and as he began to fall, Lynch turned to call Savell.
When Savell saw Thompson, Thompson was beginning to fall. His body was sagging and beginning to tilt. At first Savell thought Thompson had been injured on the lower body and he was bending to look at it. Then he fell forward up against the back stake of the pulpwood truck and slid down it. He rolled back and fell to the ground on his back. Savell ran to him and *156 moved the saw from under one of his legs where it was running at idle.
Thompson had been cut from his left ear to the right collar bone. His jugular vein had been severed and he was dead when the ambulance arrived.
The chain saw at issue is a gasoline powered mechanical instrument, which is equipped with a bow guide. The bow guide is a pear-shaped frame which is attached to the power head. The chain which does the cutting fits and travels around the pear-shaped frame. The space inside the frame is open to allow the cutting of pulpwood without the danger of binding the chain while the small tree is cut. The bow saw is a professional instrument for use by professional woodcutters. A "dog" is a comma-shaped device which is attached to the lower front of the bow guide. The proper mode of cutting is to hold the handle on the end with one hand and the top handle with the other and to firmly place the dog against the log to be cut. The chain is activated by a trigger which is a part of the handle on the end. The chain leaves the power head and moves onto the top of the bow guide traveling away from the user. When it reaches the end of the guide it returns back to the power head by way of the lower bow guide. When the dog is placed against the log, the eating action of the chain holds the log against the dog.
The plaintiffs allege that Thompson's death was caused by the kickback of the saw. Kickback can be explained by Newton's third law of physics: that for every action there is always an equal and opposite reaction. When the chain comes in contact with an object suddenly or one that the saw cannot cut, the force driving the chain causes the saw to violently move in the opposite direction from which the chain is moving. Therefore, if the chain is moving away from the user, the saw would come directly back at the operator and not necessarily cause the chain to move in an upward motion. Furthermore, if the chain is moving forward and down, as it would be on the upper quadrant of the bow, the saw would swing backward and up. Depending on the force of the kickback, the chain could come in contact with the operator. When the saw is used in normal cutting, that area of the chain which does the cutting is moving down and toward the user. If the chain met an obstacle, the saw would move up and away from the operator. If this occurred, the saw would not normally disengage from the log because the dog is on the user side of the log and the dog would hold the saw in place in the usual course.

CAUSATION

I.
As noted above plaintiffs base their case on strict liability as well as negligence. As this is a products liability case, liability will largely rest on principles announced in Weber v. Fidelity & Casualty Insurance Company of N.Y., 259 La.599, 250 So. 2d 754 (1971). Weber announced two requirements of proof in products liability cases for imposition of strict liability. The Louisiana Supreme Court said "the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect." (Emphasis added.) Thus, there must be two findings: (1) a defect and (2) injury caused by the defect. See Lanclos v. Rockwell International Corp., 470 So.2d 924 (La.App. 3d Cir.1984), writ denied, 477 So.2d 87 (La. 1985).
In some cases the connection between a defect in a product and injury or accident is clear and obvious. In others causation can only be deduced from the circumstances as, in fact, was done in Weber. In other cases, where it is not known how an accident happened, it is not sufficient to establish that a defect existed and presume a connexity between the defect and accident resulting in injury. See, for example, Semien v. PPG Industries, Inc., 413 So.2d 956 (La.App. 3d Cir.1982), in which a plaintiff's claim was dismissed on a motion for directed verdict where all that plaintiff's experts *157 showed was that an alleged design defect in a forklift could have caused an accident causing injury to plaintiff.
In summary we may say that with respect to cause-in-fact some cases present facts in which connection between cause and effect is so clear that no discussion is needed to demonstrate the connection. In others cause-in-fact cannot be established at all. In either case liability will rise or fall on proof of cause-in-fact. Nevertheless, the standard of proof in products liability cases, whether based on negligence or strict liability, is the same as in other cases.
In Nailor v. International Harvester Co., 430 So.2d 784 (La.App. 5th Cir.1983), writ denied, 437 So.2d 1148 (La.1983), the court pointed out:
"A plaintiff must prove his case by a clear preponderance of the evidence, which means the plaintiff need only show it is more probable than not that defendant's negligence was the cause of the harm, damage or injury inflicted. Causation may be proved by circumstantial evidence which need not necessarily exclude all other possible causes. Mere proof that something is possible is of little probative value as to an ultimate issue of fact, unless it be established with reasonable certainty that all other alternatives are impossible. Where several possible causes in fact are established with equal probability, but no one is shown by that preponderance which the law demands, the plaintiff has not discharged the burden of proof. Lutheran Church of Good Shepherd v. Canfield, 233 So.2d 331 (La.App. 1st Cir.1970), writ denied [256 La.360] 236 So.2d 497. [La.1970]"
It is plaintiffs' claim that Howard Thompson was killed when his chain saw kicked back and struck him in the neck. They assert that the Poulan chain saw in question contained a design defect because it was not equipped with a chain brake, and finally, that it was the absence of the chain brake which caused his death. Thus, kickback itself is not considered the defect, as noted by the majority, but rather the absence of a device to stop the saw when kickback occurs. Kickback cannot be eliminated.
The trial judge in this bench trial evidently gave considerable thought and deep consideration to all the questions raised. He wrote well-stated and considered reasons for judgment of over sixteen pages in length. However, in my opinion he committed fundamental error in the initial determination of the essential predicate of cause-in-fact. He committed the error of assuming facts not in evidence. He candidly assumed without foundation an association or substantial connection between alleged defects in design in the saw and failure to warn and whatever accident befell the deceased. In short, the trouble is that we know the results of an accident in which Thompson injured himself so as to cause his death, but we know absolutely nothing as to how or why the accident took place. Without knowledge of such facts no beginning can be made toward accepted tort reasoning processes to determine whether liability follows from the facts.
In my opinion the trial court went far afield in speculating that some association or connection existed between the absence of a chain brake on the saw and the accident. It is fundamental that negligence is not actionable unless it is a cause-in-fact of the harm for which recovery is sought. Perkins v. Texas and New Orleans Railroad Company, 243 La.829, 147 So.2d 646 (1962). The same is true of actions based on strict liability. Weber v. Fidelity & Casualty Insurance Co. of N.Y., supra. There should be little question concerning these principles since the Supreme Court handed down the bench mark case of Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La.471, 137 So.2d 298 (1962). The Supreme Court in that case said: "Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm.... A cause-in-fact is a necessary antecedent." Repeated statements of the concepts were summarized in Sinitiere v. Lavergne, 391 So.2d 821 (La.1980) in which the Supreme *158 Court, citing Dixie and other cases, said: "Negligence is only actionable where it is both a cause in fact of the injury and a legal cause of the injury. Legal cause requires a proximate relation between the actions of a defendant and the harm which occurs and such relation must be substantial in character."
In a law review article by Timothy J. McNamara, "The Duties and Risks of the Duty Risk Analysis," 44 L.La.Rev. 1227 (1984), speaking of duty-risk methodology, the author states that "the absence of a cause-in-fact relationship between defendant's conduct and plaintiff's alleged damages ends the inquiry."
In my opinion this is where this case should end because plaintiffs have shown no cause-in-fact relationship between the deceased's accident and death and the alleged defect in the Poulan bow saw or in any failure to warn of dangerous propensity. In fact, no one knows what happened. This is the basis of my dissent.
We recognize that Weber v. Fidelity & Casualty Insurance Company of N.Y., supra, held that "the plaintiff's burden is to prove causation by a preponderance of the evidence" and further stated that "[t]his burden may be met by direct or ... by circumstantial evidence." Nevertheless, as I read the trial court's reasons for judgment, I feel that his holding consists entirely of conjecture and speculation. The trial court stated its conclusions in the following language:
"Shortly after 8:00 A.M., Howard Thompson left his home and went to a wood yard at Fisher, Louisiana, accompanied by his wood stacker, Isaiah Lynch. There he trimmed a load of pulpwood, the pulpwood being too long to be accepted by the wood yard. Then he went to the woods where he was cutting at the time to trim another load of pulpwood. The pulpwood was trimmed, in both instances, while loaded on a pulpwood truck. When he arrived in the woods and observed the load of pulpwood to be trimmed, he told his stacker, Isaiah Lynch, who was with him, that he would cut the pulpwood logs on the side. He then lowered the tailgate of his pickup truck, backed the rear of the pickup truck near the rear of the pulpwood truck, fueled and oiled his bow saw, spilling some of the oil onto the bed of the truck and proceeded to cut off several inches from the end of the pulpwood logs while in a standing position, with his left leg in the bed of the pickup truck and his right leg extended forward and his right foot on the right rear dual tires of the pulpwood truck. The exact position of the bow saw while Thompson was trimming the pulpwood is not established by the evidence, but it is obvious that the saw was extended forward of his body by Thompson in order to trim the pulpwood logs in front of him. When next observed by Isaiah Lynch, Thompson had one hand over his eye and the bow saw in his other hand, bow down, in the pickup truck bed, with the saw running. Thompson then slumped and fell from the pickup bed onto the ground. Blood was seen to spurt from his neck and he later died from the loss of blood which resulted from the severing of his jugular vein. Apparently, no one observed the cutting chain of the bow saw make contact with Thompson's body or what actually caused the saw to come in contact with his body. However, from the available evidence, it seems to me that the most likely cause of Thompson's fatal injury was the kickback of the bow of the saw and the attached cutting chain when the upper part of the bow and chain came into contact with a pulpwood log behind the log being trimmed at the time, causing the bow and chain to buck or kick upward and rotate back, at high speed, towards Thompson's body, striking his neck and cutting the jugular vein. There is photographic evidence of saw cut marks on a pulpwood log behind the log Thompson was probably trimming at the time and considerable evidence that such kick-back phenomenon occurs when the upper part of the bow comes in contact with another *159 object behind the wood being cut at the time." (Emphasis added.)
The record does not support the emphasized portions of the trial judge's construction of the facts on a more probable than not basis as required by Jordan v. Travelers Insurance Company, supra.
Absolutely no one witnessed the fatal accident and there were only three witnesses whose testimony shed any light on the occurrences of the day in question. Lloyd Savell testified to the relative positions of the vehicles and to the fact that Thompson was there to trim the load of pulpwood. Savell was asked whether Thompson had done any trimming before the accident occurred and answered yes. He explained that he based his conclusion on the fact that there were wood chips or blocks laying on the ground. (Other testimony showed there were already chips on the ground from previous woodcutters.) But when asked directly if he had seen Thompson do any trimming he answered, "I didn't see him trimming it."
Lynch called Savell after the injury was inflicted, and Savell saw Thompson fall. Savell testified that Thompson was standing on the tailgate of his pickup and beginning to crumple forward. He fell against the back post of the pulpwood truck and then to the ground.
Isaiah Lynch worked for Thompson as a stacker. His testimony more or less paralleled Savell's testimony. Lynch also testified to conversations the two men had before the accident concerning the trimming job. Lynch was standing close to Thompson and it was his task to pick up the trimmed ends. There were chips on the ground, from previous cutters, when they arrived, and he began to pick them up. He testified that Thompson started his saw, and Lynch noticed that the cap was off of the oil tank causing spillage. Lynch pointed the spillage out to Thompson and he turned the saw off, refilled the oil tank, and replaced the cap. He wiped himself off and threw sawdust on the oil which had splashed onto the tailgate. Lynch testified that Thompson then restarted the motor.
The testimony proceeded as follows:
"Q And then what were you doing?
A I was still picking up some chips on the ground next to the truck.
Q Now, were you picking up chips of what he had cut, or were there some chips that was already there?
A It was some that was already there.
Q Okay. Was the saw running; could you hear it running?
A The first time?
Q After he got back up there?
A No. I didn't hear the saw the second time.
Q Okay.
A I didn't pay too much attention.
Q What was the next thing that happened?
A And when I was picking up these blocks, I knew things had got quiet to me, being I know by that time something should have been falling...."
He stated that when nothing fell, he looked up and saw Thompson holding his saw and leaning on it with his left hand over his eyes. He saw the blood on Thompson's neck and called to Savell.
The third witness was the ambulance attendant, Michael David Jones. Jones stated that he was acting chief of police of the Village of Florien, and an emergency medical technician on the Florien rescue ambulance. When he arrived at the scene of the accident, he found that Thompson was dead. He took photographs at the scene of the accident which were entered into evidence by one or both parties to the suit. He described the scene of the accident and observed that there was a footprint on the outer tire of the rear axle of the pulpwood truck which appeared to match the deceased's shoe. He also suggested that there was a recent cut on that tire. It was also brought out at trial that there was a log on the pulpwood load which appeared to have been partially sawn. It is clear *160 from the photographs that the position of the log on the pulpwood truck would have been at least at shoulder height or slightly above when the deceased was standing on the tailgate of the pickup.
Jones suggested that Thompson had positioned himself by placing his left foot on the pickup tailgate and by stretching forward with his right foot and placing it on the rear tire of the pulpwood truck. It was also his opinion that Thompson fell from this position and not from the standing position on the tailgate as testified by Savell and Lynch, the only two eyewitnesses. Jones' opinions were obviously rank speculations.
The trial court found that the accident was caused by kickback and supports this by noting that there was evidence of a partially cut log. On the other hand, the judge also found that Thompson was not cutting up high, where in fact the photographs show the cut mark on the log. He said that had Thompson been cutting up high when a kickback occurred, the saw would have traveled over his head. The plaintiffs appear to argue a like construction. The trial judge and plaintiffs simply cannot have it both ways. Choosing one negates the other.

II.
If the deceased had been cutting down low, then there is no evidence whatsoever that he was in the act of trimming a log when the accident occurred. There is no additional mark or sign showing that he had inadvertently come in contact with some extraneous object while he was sawing one of the logs. In fact, Lynch testified that nothing had fallen, which would lead one to surmise that perhaps he was not trimming at the time of the accident. There was no testimony at trial indicating that anyone ever saw Thompson cut anything." While there was testimony at trial in which parties opined that the accident could have been caused by kickback, no one could explain or venture a guess as to how the particular portion of the saw which came into contact with his neck could have done so as a result of kickback, assuming he was cutting where the partially cut log was located. Not even the experts could explain cutting angles or circumstances which could cause the extreme end of the bow to reach Thompson's neck.
The only other physical sign noted that day was what appeared, in the opinion of Jones, to be a fresh cut on the outer tire of the back axle. If the cut occurred that day, it could not have occurred while Thompson was sawing, since there was no log nearby. No effort was made at trial to determine whether it had any significance.
The trial judge discounted any suggestion that the deceased had slipped or lost his balance because he was on his two feet after he received the injury. This same rationale strongly discounts a supposition that the injury was caused by kickback. It is conceded by all parties that kickback can have great force, and it is unreasonable to believe that a party could maintain such a stance when struck by an abrupt and violent blow. It is far more reasonable to believe that he could re-establish his balance after momentarily losing it than maintain it against a violent force such as an uncontrollable kickback. Furthermore, no one could explain how Thompson could get back from the tire to the pickup after being struck a death blow.
It is equally as plausible to believe that Thompson chose to stretch forward with his right foot and place it on the rear tire of the pulpwood truck. As suggested by defense witness, this maneuver left little or no room for the width of his body between the pulpwood load and the tire where his foot was placed. In order to achieve this position, Thompson surely would have had to hold onto the pulpwood with his left hand to keep the weight of the cumbersome and heavy saw which was in his right hand from pulling him away from the load and to the ground. It is also quite likely that during this treacherous course he did in fact begin to lose his balance. In addition, the security of his footing on the tailgate was in jeopardy because of the oil spill. In an effort to maintain control, he *161 could have pushed back from the tire with the saw held only in his right hand, the hand which controls the movement of the chain. Without any resistance on the handle which accommodates the left hand, the saw would have been free to swing as a result of flailing arms into a position which would have allowed contact between the end of the bow and Thompson's neck.
What the trial court appears to rely upon as circumstantial evidence is too tenuous to exclude all other reasonable hypotheses which might account for the accident. The trial court rejected out of hand any suggestions as to how the accident might have occurred for reasons which would have been unrelated to the kickback action of the bow saw. If there are equally plausible explanations, plaintiffs' burden of proof has not been met. I regard this rejection as error in which the trial court was clearly wrong. As I have emphasized, no one knows what Thompson was doing or what happened.
It may well have been Thompson's intention in positioning his pickup truck behind the pulpwood truck and lowering the tailgate of the pickup to stand with his left foot on the tailgate and one foot on one of the right rear tires of the pulpwood truck. No one ever saw Thompson in this position. The same man who suggested that Thompson was in this position testified that the evidence at the scene indicated that Thompson fell directly to the ground from this position. This theory is in direct conflict with the testimony of two eyewitnesses who saw Thompson standing on the tailgate before he fell.
When Lynch saw Thompson after the accident he was standing, as noted above, with both feet on the tailgate of the pickup truck. From that position Thompson fell backwards onto the ground. The facts are too meager and unknown to permit a fair conclusion, even on a more probable than not basis, of just what happened.
What the trial court appears to rely upon as circumstantial evidence consists solely of testimony that there was a footprint present on the outer tire of the rear axle of the pulpwood truck which matched Thompson's shoe, opinion evidence that there was a recent cut on that tire, and that a certain log on the truck was partially cut. I find that these facts do not persuasively indicate anything. We have recently stated in Jones v. Employers Mut. Liability Ins. Co., 430 So.2d 357 (La.App. 3d Cir.1983) at 363:
"Essentially, plaintiff's burden of proof is the same whether his cause of action is based on negligence or strict liability, i.e., that the fact or causation sought to be proved is more probable than not."
Plaintiffs in the case before us must prove that the injury was caused by kickback, and they must do so by a preponderance of the evidence. Plaintiffs have failed to present a plausible reconstruction of the events of that day. They claim there was indication of a partially cut log, but then claim also that Thompson could not have been cutting up high where the photograph indicates that log was located. Plaintiffs ask the court to support a finding of cause based on the fact that chain saws can in some circumstances kick back. The law and this court require more.
It is perhaps axiomatic that liability does not automatically follow from proof of injury. It is not every accident producing injury which results in liability. LaBorde v. Gen. Motors Corp., 422 So.2d 1333 (La. App. 3d Cir.1982), writ denied, 429 So.2d 153 (La.1983); Pitre v. Aetna Ins. Co., Inc., 434 So.2d 191 (La.App. 3d Cir.1983), rev., 456 So.2d 626 (La.1984). As I indicated above, the alleged causation factor in this case consists of two parts: first that the accident was caused by kickback and second that installation of a chain brake would have prevented this particular accident. Ordinarily the inquiry would end here because I find that the first aspect of causation was not established. Since the majority has addressed other issues, I will do likewise.

III.
We must now consider the second phase of the question of causation, whether the *162 installation of a chain brake would have prevented Thompson's accident.
The majority has neglected entirely, in its discussion of causation, to address this second question, a necessary predicate to finding Poulan liable for the incident. The majority touched upon this issue somewhat in its discussion of defective design. I believe this question is more accurately one of causation and should be discussed in that context.
The majority holds that the trial court was in error when it incorrectly held that the saw was defective because it kicked back. The majority noted that it is impossible to prevent kickback and held, as plaintiffs had pled, that the saw was defective in design because it did not have a chain brake on the saw.
Since the purported defect was that the saw had no chain brake, it is not enough to prove that the accident was caused by kickback. The plaintiffs must prove that the injury was caused by the defect, therefore the plaintiffs here must prove that the injury would not have occurred if the saw had been equipped with a chain brake.
The majority holds that "[w]here the testimony of the expert witnesses differs, it is largely a matter of fact for the trier of fact to determine the most credible evidence...." It was noted that the plaintiffs' experts testified that a chain brake would have prevented or minimized Thompson's injury, therefore there is no manifest error. I agree with this statement of law, but I also note that there is a point at which no reasonable trier of fact could have made its decision based on the facts before it.
The most telling words in this case are those stated by almost everyone; namely, that based on the lack of information concerning the accident, they just could not know if there would have been a different result. If the parties knew where the victim was cutting and if he was cutting at the time of the accident, calculations could have been made considering angles and stopping times to suggest an answer to the issue concerning whether the brake would have stopped the chain in time. There simply was no such evidence.
The location of the saw would also bear on the answer to the question of whether the brake would have been activated in this instance. The chain brake is activated by a bar that runs across the power head of the saw. It is perpendicular to the bow guide. When the saw kicks back, it rotates back and the bar comes in contact with the user's hand or wrist activating the brake. The brake handle does not run all the way around the power head, so it will not be activated in all positions. If the user turns the saw on its side, it is unlikely that his wrist can contact the brake bar. Another factor in deciding whether it would be activated is how high or low the saw is being held. If the user is cutting something up high, the rotation caused by the kickback would cause the chain to hit the user before he could activate the brake. There is a greater risk that this will occur with a bow saw than a bar saw because the round shape of the bow causes the chain to be closer to the user initially.
The only evidence at trial that would indicate that Thompson was in the act of cutting is the saw mark on the log which appears in the photograph. The photograph includes the figure of Thompson, and a comparison of his figure with the load of pulpwood clearly shows that the log in question was at about eye level. The plaintiffs' expert testified that if Thompson had been cutting at eye level, the saw would not have struck him at all, but traveled over his head.
Plaintiffs' expert was qualified in the field of engineering and in safety design, but it is clear from the record that he had no experience in the field of chain saw design per se. He had likewise never observed chain saw users in the field in his position as an expert. His experience appears to be concentrated in the area of expert witness. He testified at length concerning stopping times of chain brakes. In his calculation he failed to consider the time which elapses between the kickback and the activation of the brake. Neither *163 were other factors considered which may affect the stopping time, i.e., maintenance of the saw. In addition, he used the wrong physics formula to explain the stopping of the chain.
The inconsistencies and conjecture which were a part of the witness's testimony indicate the error of the court's decision.

DEFECT IN DESIGN
The Louisiana Supreme Court has made a definitive statement concerning products liability cases in the recent case of Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986). This suit arose in Federal Court. Halphen v. Johns-Manville Sales Corp., 755 F.2d 393 (5th Cir.1985). Questions concerning Louisiana products liability law were certified to the Louisiana Supreme Court.
In dealing with questions concerning defective design the court pointed out that there were three reasons for finding that a product is unreasonably dangerous because of its design. First, a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product. This is a weighing process that focuses on the product only, not the people involved. This inquiry decides whether the product is dangerous per se. Second, although balancing under the risk-utility test leads to the conclusion that the product is not unreasonably dangerous per se, alternate products were available to serve the same needs or desires with less risk of harm. Third, although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequence.
We believe the plaintiffs' claim lies with the last of these reasons, i.e., the saw in question is unreasonably dangerous because the design should have included a safety device, a chain brake.
The first step in dealing with a design defect question is to balance the utility and the danger of the product. The majority has apparently found that the product's utility outweighs the risk, considering the importance of the power saw to the lumber industry. It continues with the question of whether there was a better way to make the product. The majority concludes that the saw should have had a chain brake.
In litigating the third type of inquiry in products liability cases the parties are allowed to present evidence concerning the behavior of the manufacturer. Evidence concerning the feasibility of the suggested design or the advisibility of incorporating the change in the product is also pertinent.
In this case the defendants contend that a chain brake is an unreliable safety device, and the company has made a thoroughly considered and thoughtful decision not to incorporate it in their standard design for saws sold in the United States. The company has chosen other safety devices. Defendants further claim they have no duty to incorporate an unreliable safety device. They cite Braxton v. Georgia-Pacific, 419 So.2d 125 (La.App. 2d Cir.1982) in support of that view.
In Braxton the court held that the manufacturer was not required to incorporate unreliable safety devices in the design of its product. In Braxton, the victim and a co-worker were moving bundles of steel rebars from one area to another. A crane was used to effectuate the move. The boom of the crane was extended and the load line was tied to the bundle of rebars. While the crane was moving, the two men were walking on the ground holding onto the steel rebars to guide and balance the load. At some point either the load line or the boom of the crane came in contact with a high voltage energized electrical line. Upon contact with the line, the rebars became energized, electrocuting Braxton.
The plaintiff alleged that the crane was unreasonably dangerous due to the failure of defendant to incorporate three safety devicesa boom shield, an insulated link, and a proximity warning devicein the design and manufacture of the crane. There were other issues presented not pertinent to this question. The defendant contended that the crane was not unreasonably dangerous *164 in normal use without the safety devices, since the devices are unreliable.
It is helpful to consider the qualities of the safety devices in the Braxton case at page 128:
"The boom shield is designed to prevent contact between the boom of the crane and an energized powerline by acting as a insulator. The boom shield is a metal framework attached to the very end of the boom with insulated connectors to insulate the shield from the boom. The boom shield is limited in that it only covers approximately fifteen feet of the boom. Upon contact of the upper end of the boom with a powerline, the boom cage acts as a buffer to prevent the boom from becoming energized. The evidence established that boom shields are primarily used for lattice boom cranes rather than for hydraulic cranes, such as existed in this case.
The insulating link acts as a hooking device at the point at which the load is attached to the cable. The links come in various sizes and capacities depending upon the type of load and electrical voltage. A portion of the link is made with plastic or a non-conducting material which must be kept absolutely clean from contaminates. The device is designed to prevent the load from becoming energized if the load line or the boom contacts a powerline. However, the line would not prevent the load from becoming energized if it was touching the body of the crane.
A proximity warning device is similar to a radio receiver and is designed to give a warning when the crane is near an energized powerline. An antenna would be placed on the boom to detect the electromagnetic field emanating from a powerline and an alarm would sound when the crane was a certain distance from a powerline.
The device requires considerable adjustment and calibration to make it effective. An alarm device could be situated on the outside of the crane so that workmen on the ground would be alerted."
Each of these devices appeared to work in certain conditions and under certain circumstances. The first two devices are limited in that the shield only protected a limited area around the boom and the insulating link only protected against energizing contact by the boom and load line and not the body of the crane. In addition, the insulating link had to be kept absolutely clean.
In the case before us there are similar limitations. The chain brake will not protect a user who is cutting up high. The chain brake will not protect a user whose hand cannot contact the brake because he is not holding the saw in a straight upright fashion. If the saw is turned on its side the brake will likely not be activated. The brake will not protect a user if the accident occurs faster than the time it takes for the chain brake to clamp down and stop the brake.
The third safety device in Braxton was a proximity warning device. The limitations inherent in this safety device are somewhat different than the first two. In order for this device to work it had to be constantly maintained. Proper adjustments and calibrations were necessary to make the device operative.
The chain brake is very much like this third device. The saw, which is used in a hostile environment, must be constantly cleaned and maintained. The actual brake device is inside the housing of the power head where sawdust and trash easily collect. The chain must be oiled, and a collection of oil on the brake greatly reduces its effectiveness. It was noted in Braxton that the company would be doing a disservice by placing these devices on the crane because their presence would lead the workers to depend on these devices for protection rather than sound judgment. The chain brake presents an even greater danger because, even if a user maintains and cleans his saw, there is no way he can test it to see if it is operating to stop the chain fast enough. This cannot be done visually, only by using testing machines.
*165 The trial court and majority contend that there is sufficient evidence in the record to show the brake is reliable. This is not an accurate assessment of the record.
The plaintiffs presented two expert witnesses. The second witness was a statistician. While his testimony was interesting, it is useless to prove anything. The figures that he used were figures which were never entered into the record for their truth or accuracy. Statistics is a shadowy field which can generally be used to show almost anything by careful manipulations of figures from different viewpoints. In this case, the figures were used without regard to the effect that other factors may have had.
The only witness to testify as an engineering expert for plaintiffs admittedly had no experience whatsoever in the design or use of chain saws. While he may be an expert in safety design, he was without any knowledge concerning chainsaw design and the use of chain saws in the field by real log cutters. By his own admissions he had never tested chain brakes on a bow saw. In fact, he had never even seen the Poulan saw in question with a chain brake on it until trial.
The reports that were entered into evidence are hearsay and were accepted into evidence only to prove that Poulan was aware of them and not for the truth of what they purport to convey. They are completely unverified reports. There is no information concerning other factors which apparently could have had great effect on the results. There was no person there to testify to the validity of sources and methodology of the so-called studies.
The majority notes that McCullough has put chain brakes on all of its saws to indicate that other manufacturers are producing a safer saw. But plaintiffs' expert testified that McCullough had never done any independent testing on the reliability of chain brakes before incorporating the brake into its product. In fact, plaintiffs' expert admitted that there is no consensus in the industry or among interested parties that chain brakes ought to be mandatory in the United States.
Finally, the federal government's Consumer Product Safety Commission has concluded that there is insufficient proof of the effectiveness of chain brakes to warrant adoption of a standard mandating their use. Federal Register Vol. 46, No. 90, p. 26269, May 11, 1981.
The trial judge relied heavily on the testimony of Joe Lambert, a professional woodcutter, to find the brake reliable in the field. Joe Lambert testified that he had had a kickback and the brake had stopped the chain. The judge believed it showed that the brake worked. The truth is that the chain never reached Lambert's body. The only way we could know that it worked in time would be if a kickback occurred with such force that the saw came in contact with his body. If the chain had stopped before contact we would know it worked. The proper assessment of Joe Lambert's accident is that Joe Lambert stopped the rotation of the saw in time with his own hands. The outcome was not the result of the chain brake.
Plaintiffs argue that chain brakes can be compared to seat belts. They point out that seat belts do not always save lives, and, in fact, they can trap someone and cause their injury. They argue nevertheless this result would not justify their elimination. They also argue that seat belts do not encourage risk taking because of reliance. This comparison is inapposite. The fact is that seat belts always do what they are supposed to dothey hold people in their seats. Chain brakes do not always do what they are supposed to dothey do not always stop.
A more helpful comparison would be to compare the brake to a life line used by a window washer or a steel rigger, or any worker who is performing a task at a great height. This device is a belt tied to a rope or line which is attached to a safe solid object. These workers expect the line to hold them if they slipevery time. The security of knowing that it will, allows the workers more freedom to take greater *166 risks. Of course the life line may not save every life. Conceivably, the worker could be hurt by the jolt of the fall, or he could swing into another object, but the rope would hold before the worker could hit the ground. The problem with the chain brake appears to be that it won't necessarily stop the chain before it hits the user and the user cannot know if it is operating properly. If the life line had a tendency to slip at unsuspecting times it would likewise be an unreliable safety device.
I do not believe a manufacturer should be required to incorporate such an unreliable safety device.

WARNING
The trial court noted that manufacturers have the duty to warn foreseeable users of the possible dangers of their product. The court held that Poulan had this duty to warn and further that the warnings were inadequate. The majority affirms this decision.
I believe the majority is correct in finding that the warning was inadequate to inform the unsuspecting user of the kind of danger and injury which could occur as a result of kickback. But our jurisprudence is clear that a manufacturer does not owe a warning to someone who already knows of the danger or to someone classed as a professional.
In the case of Halphen v. Johns-Manville Sales Corp., supra, our Louisiana Supreme Court discussed the problem of warnings as follows:
"Although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Winterrowd v. The Travelers Indemnity Co., 462 So.2d 639 (La.1985); Hebert v. Brazzel, 403 So.2d 1242 (La. 1981); Chappuis v. Sears Roebuck & Co., 358 So.2d 926 (La.1978), cf. Rey v. Cuccia, 298 So.2d 840 (La.1974)." (Emphasis added.)
The record is replete with testimony that Thompson knew of the propensity of the chain saw to kickback and of its danger. The majority notes this fact in its opinion. In fact, Thompson had experienced a kickback himself which did inflict an injury.
It is a well-stated axiom that one should not be required to do a vain and useless act. The court should not require this manufacturer to warn Thompson of a fact he already knew.
For the reasons given above I dissent from the majority holding in this case.